Good morning, Your Honors. May it please the Court, Glenn Chappell from TICO and Zavarri LLP. I represent the relators in this False Claims Act and Anti-Kickback Statute case. I'd like to request three minutes for rebuttal, if I may. Your Honors, the District Court erred when it ruled that the False Claims Act's public disclosure bar precludes this lawsuit. The public disclosure bar requires dismissal of a case if substantially the same allegations or transactions were disclosed through qualifying public records channels prior to the suit. That is not the case here, regardless of whether the Court applies the familiar X plus Y equals Z rubric that the Court has often used, or whether the Court simply asked, as it did in Horizon West, whether the material elements of the fraudulent transaction were disclosed. In my view, that's the same test. It's just different ways to word the same test. Now, Your Honors, the District Court got it right with respect to other key issues in the case, including its application of Rule 9b to the allegations in the First Amendment amended complaint, and with respect to its analysis of the AKS's Safe Harbor defense. Time permitting, I'll touch on those, but for obvious reasons, I want to focus primarily on the public disclosure issue. In turning to that issue, Your Honors, what we had prior to this lawsuit was two separate CMS databases that had raw data on payments that were made to physicians, and we had prescribing volumes in a different database for prescription drugs that were reimbursed by Medicare. Those allegations were not sufficient to trigger the public disclosure bar, because what they missed was any hint or any kind of information that the programs that these payments were made under were sham programs. They were fraudulent programs that had no legitimate educational or business purpose. The only purpose of those programs was to funnel money to physicians as investments that defendants hoped to be returned in the form of increased prescriptions for the four at issue drugs. To put it in the familiar parlance, that is the Y in the X plus Y equals Z formula, and because that Y is missing, you cannot find any information that these programs were made for. I think I agree with you that it could be the Y. This is new information, but is there enough detail to show that the Y is actually the Y that you say? Because a lot of the allegations about that are fairly vague, about lunches, free lunches. I agree with you, some of it may seem a bit unseemly, but it doesn't mean it's illegal. I mean, you're a lawyer. We have e-discovery vendors who come into lawyers' offices, give lunch, ostensibly educational. My guess is there's some ulterior motive of keep us in mind type of thing, but it doesn't mean it's illegal, and I don't know if there's enough here to show that these payments were illegal under the anti-kickback statute. Your Honors, it was enough, because what we alleged here is specific indicia to show that these programs were not stand-up programs. We showed examples, for example, where payments were made to physicians for educational programs that never happened in some instances. We showed examples where payments were made that departed from the company's own internal fair market value determinations without any kind of justification or any finding. We gave specific allegations on why these payments did not meet the personal services safe harbor defense, and I'm jumping a little bit ahead there, but we explained how they didn't meet the seven criteria of that defense. Were there enough details, for example, in the first one that you mentioned about getting paid for events that never occurred? Were there details of who it was, when, where, what? Were those in there? Yes, Your Honor, I'm looking for the specific allegations, but we allege that it was about a $10,000 payment to one particular doctor. We named that doctor in the complaint, and we gave the time frame that that occurred, and we said that educational programs never happened. And I'll just mention that that is an example where nothing like that could be derived from the CMS databases that defendants rely on, because all that that shows is that payment of $10,000 and some change, and then a canned description pulled from a drop-down menu that says it was something like payment for a speaker program. Nothing more specific than that in the public record. So if that doesn't come from the public record, does it come from the relators? It does, Your Honor. It does come from the relators. What other evidence? I read your complaint, and there are a lot of things in there that I thought, if these are true, some of these things are shocking, although I don't have a lot of context for that. But it looked like there was a lot of stuff that you compiled from the databases. And so my question is a follow-up on Judge Lisa's, is what if the margins came from the relators? What information was not available through the databases? Because a lot of stuff's been compiled, and that's value-added, but it comes from the databases. Absolutely, Your Honor. So let me answer that question in reverse order, in a sense. What was in those CMS databases was simply the payment amounts, the dates, and then in a in any other way. What the relators specifically added here is all kind of information about the substructure that underlied those payments. For example, we alleged that the defendants used a scorecard to track return on investment on these speaker programs. We gave an example where Regeneron and Sanofi dropped one doctor, Dr. F., when his prescription was not available and his prescription volumes went down after he entered the speaker programs and started receiving those payments. We gave one example of Dr. R. where he threatened to cancel his speaking engagements if they did not pay for him to stay in a resort. That was not anywhere found in the public record, and they complied even though their own internal policies said you can't do that. You've given us a great deal of evidence as to how much doctors were paid for certain things and then alleged that this was X number of times, 3.5 times, 8 times the company's own internal. Where did you get the information on the company's internal policies? That was from our relators, Your Honor. That was information that they had from their perspective as employees in the sales department of Regeneron. Just another example, we talked about this one doctor who was named as Dr. D. in the First Amendment Complaint where he was paid for speaker programs at a celebrity steakhouse in the Aria Resort and Casino, and then he was lodged up in the Palazzo Hotel, the Venetian resort. All of those things violated the company's internal policies for payments under these speaker programs, and they were just disregarded. I think to sum up the answer to your question, everything that was not just prescription volumes and the actual dollar value of the amount paid, everything else comes from the relators in this case, Your Honor. That's why the Public Disclosure Bar does not apply. On that point, I would just like to talk about a little bit of a different issue, last thing on the Public Disclosure Bar. That is, think about how the defendants prepared their defense, their public disclosure argument in this case. What they did is they took the allegations in the First Amendment Complaint, they looked at the specific doctors named, the specific time frames, these four specific drugs. They took all that information, and then of course the payments and everything, and reverse engineered information on the payments and the prescriptions from the information in the two CMS databases. But if you put yourself in the shoes of a person who is looking at this information without benefit of the First Amendment Complaint, all they would have is decontextualized raw data on, again, payments and prescription volumes. It would be impossible to sort of connect any of those dots together. For example, how those payments had any kind of tie-in to the prescription volumes of these four drugs in particular. Those are aggregate records that doctors from across the country and pharmaceutical companies and other companies across the country feed into those records. And so just thinking about it from that standpoint, I think illustrates very well why the government or no one could have been put on the trail of fraud in any way just by looking at these raw numbers in the databases. Unless the Court has other questions on the Public Disclosure Bar, I will touch briefly on Rule 9b as well. You know, as you said, Your Honor, a familiar way to look at that is the who, what, where, when, and how rubric. So I will use that again here just to illustrate that. If you talk about the who and where, we allege examples of 15 different physicians in seven different states who received remuneration from these fraudulent speaker programs and then whose subscription volumes went way up. You describe it as fraudulent, but why are they fraudulent? We gave examples of that in the complaint as well, Your Honor. They were fraudulent because they were often not attended by anyone. They were fraudulent because they did not have any bona fide educational content. You say that. You say it didn't have any educational content, but we don't know what was said, what the topic was. A lot of its descriptions of it's fraudulent, there was no educational purpose, but we don't know any of that detail. Well, I would disagree with that, Your Honor, to this extent. We did allege in the first amendment complaint explicitly that the topic of conversation in these so-called lunch and learn programs was how to treat the prior authorization process as just a paperwork hurdle that had to be cleared. And that was the topic. There were no new updates about the drugs at issue here. And we allege in the complaint again, another example that Regeneron had a slide deck about these drugs and information about those. That was not updated and often was not even referred to in these trainings. So I disagree that we didn't go into detail about the content. Counselor, does your case turn at all as to whether these drugs were medically necessary? So I put it this way. I don't think it turns on that because what the anti-kickback statute turns on is the purpose of the payment. And then what the False Claims Act focuses on is whether the claim that was submitted was linked to a payment that violated the anti-kickback statute. So I don't think that there needs to be a finding that any particular prescription was or was not medically necessary to get there in this case, Your Honor. So you don't have to prove that something was being over-prescribed? That's correct, Your Honor. These might be perfectly good products. The way that the sales were conducted violates the law. That's the heart of your complaint? Yes, Your Honor. That's correct. Even if the prescription was okay for this person, it was still linked to a kickback. And therefore, that renders it false under the False Claims Act. For it to be a kickback, there has to be an inducement. There has to be causation, not just correlation of they were paid to speak at an event and a certain drug was prescribed. So we agree with the way that the Third Circuit described that issue in the Greenfield case. And what the Third Circuit said is the causation standard is that there does have to be a link between the payment that was made that was a kickback and a prescription. But that prescription does not have to be the but-for cause of the kickback. It just has to be, in other words, tainted by the presence of an illegal kickback. The bigger conceptual problem I'm trying to figure out here is, again, some of the allegations you make, unseemly, but is it illegal? You know, just a rough, different analogy. Obviously, different laws. People who donate money to political campaigns and then it turns out the elected officials pass a law that's beneficial to the person who donated. Perfectly legal unless there's some quid pro quo. Unseemly, sure, and I think that's a lot of complaints about how things work. But isn't a lot of this kind of falls into that, a little bit unseemly maybe, but not necessarily legal unless there's a little bit more evidence showing kind of a causation there? No, Your Honor. I think because what this, maybe in some circumstances elsewhere, it might just be unseemly and not necessarily illegal. But I think all this evidence is important here because it shows the true purpose of the payments that were made to the physicians. And that is indicia that the true purpose was to induce increased prescriptions. And that's what makes it violate the anti-kickback statute. So it's not that the payments themselves were on their face illegal. It was the purpose of those payments. And then, of course, if you get into the defenses, that it did not meet the various safe harbor defenses. But I think that's the key distinction here is that it's not that the unseemliness is not what makes it illegal. The purpose of it is what makes it illegal, Your Honors. Counsel, let me ask you this. I know you're running short on time, but I just want to make sure I understand. The allegations that you discussed earlier about keeping the scorecard for return on investment, the dropping Dr. F, dropping Dr. R, Dr. D being paid for, or attending a celebrity steakhouse to do his speech and then getting a nice hotel, are those the allegations that you argue show inducement and meet the requirements of Rule 9B? So that, Your Honor, our argument is that if you look at the complaint holistically, when you take those allegations and you combine them together, that's what satisfies Rule 9B because each one is a different data point that when you add it up shows the presence of this program. And so, for example, you might have particular instances, one-off instances, if you identify them in isolation, that might perhaps not be enough under Rule 9B. But when you take everything together and then all the stuff about the programs and these individual examples and then you combine that with the data on prescription volumes, when you add it all together, we argue that we easily clear the bar under Rule 9B. And I would just add one little clarification, Your Honor. You mentioned inducement. We don't have to show that the inducement actually happened. We have to show under the anti-kickback statute that the purpose was to induce that prescription. So I just want to make that  One thing you can elaborate during rebuttal, I think I found the paragraph in the complaint about payments to doctors for events that never occur, and I think it's paragraph 162 of ER 801, and it says Regeneron even paid $10,595.10 to doctors for events that never occurred, further showing the purpose of the program was to induce doctors to prescribe more of the covered drugs and not to educate. And I guess there, I just didn't see any additional details other than that statement. There's the dollar amount, but who the doctors were and what the events were. But anyway, I'll take a look at that and respond to that in rebuttal. I'll give you two minutes extra for rebuttal. Thank you, Your Honor. We'll take a look at that. Good morning, Your Honors. May it please the Court. Matthew Rowan on behalf of the Regeneron defendants. So I want to start by taking a step back and providing a contextual sort of framework for what we're dealing with here. I mean, this is not a typical case, even in the context of the relatively atypical confines of a False Claims Act case premised on anti-kickback statute violation, because normally sort of the key reveal that a relator has is that payments about which the government was unaware happened, or that the payments about which the government was aware were actually not what they appeared on the forms. And the reason that this context is particularly appropriate for the public disclosure bar is because all of this is in the context of a comprehensive public disclosure regime. I mean, I think Your Honors all sort of recognized that there is potentially something unseemly with payments to physicians by prescription drug companies. But Congress recognized that that's not sort of malum in se, and the way that they were going to get at the potential problems that can arise is by requiring a comprehensive, down to the dollar, public disclosure regime. And so this is, and that's why, you know, to look to these specific allegations, this is not a case like this Court's Sam Jones decision from a few months ago, where the allegation is that a company was making payments to the brother of a doctor about which the government was unaware. This isn't even a case, and to go to specifically to paragraph 162, I'm happy you highlighted that. This isn't a case where they're saying the payments aren't what they were, you know, reported to before, or that there are payments about which the government was unaware. The single allegation that they have about payments that were for true shams is paragraph 162. And it does not say who, what, where, when, how, it says nothing. It just says $10,500 for a program that never happened. If that allegation were followed by a whole bunch of, you know, the things you think about for 9B, I'd have a really hard argument here. Because then you'd say, oh, like, there's actually fraud on the government. Either there's a Sunshine Act violation, or they'd say, look, you know, this was reported as $10,000 for a speaker program, but actually it went to buy a Rolex. In that kind of context, a whistleblower's coming forward with, like, real private information about which the government is unaware, and that can move the ball forward in terms of finding a fraud. But what they have here is essentially allegations that, well, Regeneron was, you know, making payments in ways that were essentially profit-maximizing. And, I mean, of course it was. Well, let's put it in a little bit different context. Regeneron, according to the complaint, Regeneron had an internal schedule of what it regarded as reasonable compensation for certain kinds of services the doctor would provide. If the doctor's going to go and speak at a conference, then their standard says, here's how much we're going to give you. And they've been very specific to say, yes, and Regeneron violated all of its own internal guidelines, and sometimes in very substantial amounts. Sometimes it was 3.5 times. Sometimes it was nine times what their internal required. Or if a doctor had so much experience, they would be Tier 1 or Tier 2, and all of a sudden they get bumped to a different tier. I don't remember whether it goes up or down. Right. They get bumped to a different tier that gives them a great deal more compensation than, again, Regeneron's internal evaluation of what was an appropriate and reasonable fund. So I mean, two responses to that. The first is the fact that the rates are increasing is all public. I mean, the fact that each doctor, you know, that they want to focus on that their rate for a consulting service went from X to X times 1.5, that's public. And the fact that the payments, you know, when the payments are made is public. The fact that, you know, it's $1,000 in February and then $1,500 in November, that's public. If Regeneron having internal guidelines and the fact that it made some deviations from it is enough to sort of infer fraud, well, then Katie barred the door. What you're sort of telling companies to do is actually don't have internal guidelines, because if you ever deviate from them, you're going to be stuck with a, you know, or a later who can come in and, you know, I mean, I think it's important to sort of step back and look at like the allegations here are not at the end of the day that these programs didn't happen or that they weren't educational. I mean, I think it's important to look at what so what they say as for the allegations that these weren't educational, they have three paragraphs. Paragraphs 296 and 297. What they say in paragraph 296 is or with 295 is that they have one essentially review form and it says that these programs will be better if they were focus groups with key thought leaders. If that's enough to say that it's a sham as opposed to somebody had feedback, I mean, gosh, that doesn't sort of seem like a thing that you would sort of get over the bar against the backdrop. So the problem that I'm struggling with, and I realize this is not sort of your classic typical CFA case, or FCA case, is trying to figure out what to do with sort of the relative amounts that people got. Okay, I realize a doctor's been given $10,000. Okay, is that a lot of money or is that a little bit of money? I don't know. I've never been part of a speaker's bureau. I'm barred from accepting that kind of compensation as a public official. So I can't tell whether that's a lot of money or a little bit of money. So the only way that we've been able to gather whether this money, which is being disclosed, is a lot or a little is by looking at what Regeneron thought the appropriate schedule was that would be the fair market value. Now, if a doctor's coming in and saying, yeah, but I'm not going to come and talk unless you give me $50,000 or $100,000. Now, at some point, can we say that's just not fair market value? So, I mean, I think I would respectfully say that you're not thinking about it exactly the right way because the sort of one entity that knows what fair market value is, at least constructively, is the United States government. Because all of the payments are reported to it from every pharmaceutical company to every doctor. So the government knows what fair market value is. And again, I mean- And does the government have a schedule? No, no, no. The government will be able to know from the reports what the fair market value is. It can run regression reports. This is an argument that the United States, if this was a serious case, the United States should have taken it up. But because they didn't take it up, it therefore fails. Well, I mean, I do think there is something to that here. I mean, again, so the United States gets two bites at the apple. The United States can always disempower the public disclosure bar, right? They can object to the operation of the public disclosure bar and then they can intervene. And the allegations here, and this gets sort of to what Rule 9b is supposed to do here, but the allegations here are that upwards of 75% of the prescriptions that were written were false. They don't tie any particular prescription that was written to any particular payment. And I mean, so just based on their allegations, this is a multi-billion dollar case. They're essentially saying that the leading treatment for the leading cause of blindness in Americans, which is ILEA, which treats wet AMD, that actually the overwhelming majority of prescriptions that were written for that were all because all of the doctors were on the take. I think that sort of general superstructure of an allegation shows why with the Third Circuit's held on the resulting from language in the 2010 amendment to the anti-kickback statute and what the district court applied here is this sort of temporal correlation. You gave a payment and then later prescriptions were written that they can't satisfy the statute. That's not resulting from, that's just shows that, you know, it's sort of post hoc ergo proctor hoc, which is a logical fallacy, not a standard of causation. And I think there's a reason that each of the last three circuits that has addressed what the resulting from language means, most recently the First Circuit in a case that bears Regeneron's name said, no, you need actual allegations that make it plausible to infer that the prescriptions wouldn't have been written but for the payments. And look, I'm not here to say that you can never do that in this sort of context. I think if you had a bags of cash case where a drug company came in and they had, you know, unreported payments that violated the Sunshine Act and they said, hey, you know, here's your $50,000 in a, you know, baggy, I think you'd have a pretty strong inference that actually that $50,000 is what, you know, that the subsequent prescriptions resulted from that payment. But when you have reported payments, all of which are reported and which the government apparently doesn't think are outside fair market value, you need more than just the fact that there were payments and the fact that there were prescriptions. How do we know that the government believes that this is fair market value? I'm not saying that the government believes this is fair market value. I'm saying the government can determine what the fair market value is because it has all the data. Has the government done that? Do we know whether the government's done that? I mean, I think constructively the government has as a matter of law based on how the public disclosure bar works. All of those numbers are in its files and it is charged with knowledge of all of the payments that are made. So, I mean, I think, yes, as a matter of law, the government has essentially made a determination that according to the government that this is fair market value. Now, that wouldn't bind a court, but I do think it's sort of instructive about what we're looking at here. But I do want to sort of make the point about why the pleading failures and the resulting from language in the AKS actually matter. I mean, they have no, and I think it's sort of the cleanest way to just affirm across the board. They have no allegation, for instance, that there was a different treatment that a physician could have offered that was FDA approved. They sort of gesture toward, well, there was a cancer treatment that could be compounded in a compounding pharmacy that could be prescribed instead of ILEA, which is injected into your eyeball. But they have no allegations that actually there's reason to believe that doctors would have done anything different had they not gotten the, you know, 1.5 original rate for one or two, you know, speaker programs. What's the relationship between the public disclosure bar on the one hand and, well, you say rule 12b6, you know, rule 9b. I mean, are we, is the analysis essentially the same? We're just looking through two different prisms or are there different requirements? So, I mean, I think in this particular context, where all of the payments and all of the prescriptions are public, that they sort of are different ways of getting at the same problem. And that's obviously not always going to be the case. But that's why I sort of started with this is a particularly odd sort of False Claims Act case because, you know, they're not coming forward with, except for paragraph 162, which I think, Judge Lee, you were exactly right to point out, that can't come close to 9b because it just sort of has no who, what, where, when, how. But what they're coming forward with is essentially allegations that, you know, we should think that Regeneron sort of had a bad motive. But Congress knew that pharmaceutical companies are profit maximizing entities and the way it got at that was by creating this, you know, public disclosure regime. And against that backdrop, I mean, I just think, you know, if a whistleblower comes forward with and says, you know, government, I know about payments about which, you know, you aren't aware. Or the payments that they told you about were actually for golf clubs instead of speaker fees. Those are sort of real, you know, whistleblower claims that give the government material information, material facts about which it was unaware. I think you've well exceeded your time. So I want to let your colleague speak. Thank you. Good morning, your honors. I'm Aaron Van Oort for Sanofi. May it please the court. As to Sanofi, this case is resolved by a simple application of the public disclosure bar because the two relators never worked for Sanofi and they don't adequately plead any genuinely new and material information as to Sanofi beyond what Sanofi already reported to the government and the government reported to the world on that. And I want to address very specifically what counsel for the relatives pointed out as his four examples. He gave four examples of the same four from the brief. What your honors are going to see is as to those four examples, they have no faxes to Sanofi. So example one is programs that never happened. Judge Lee, this is paragraph 162 that you're asking about. That's deficient as to Regeneron for the reasons that my colleague explained. But the critical point for Sanofi is Sanofi doesn't appear in that paragraph. There's no allegation that Sanofi made any payment to any doctor that wasn't reported. The next thing that he alleges is that they deported from internal policies. Judge Bybee, this is what you're asking about, about the tiering and exceeding tierings. What you'll see, that's paragraph 139 in the complaint. As to Sanofi, it is expressly on information and belief, which means they have no fax as to Sanofi. The third example is the scorecard where they're supposedly tracking metrics internally about return on investment, put aside whether there's anything wrong with that. That's paragraph 164 of the complaint. As to Sanofi, it is expressly on information and belief, meaning they don't have any information, no faxes to Sanofi. The last one, they allege that as a doctor was supposedly dropped because his prescriptions went down. That's paragraphs 180 and 181 in the complaint. That doctor prescribed only ILEA. And as the investigators admit, Sanofi had nothing to do with ILEA. I will say as a general matter that every time this complaint says Regeneron and Sanofi in the same breath, your honors can't trust it. It's not true. It's group pleading because they repeatedly allege things like Regeneron and Sanofi paid a doctor and then you look at Exhibit A at the end of the chart and it turns out only Regeneron did. They say Regeneron and Sanofi manufactured drugs in paragraph 2. Sanofi didn't manufacture any of them. They repeatedly say like paragraph 4, Sanofi and Regeneron promoted ILEA. They admit Sanofi didn't plead ILEA. The group pleading here is simply indefensible as to Sanofi. There are no good faith allegations as to Sanofi. This is a simple case as to Sanofi. The district judge is entirely right. Regarding the public disclosure bar, I think this court could usefully do a couple of things. There are two big picture principles here I think that would be useful to write in an opinion. Number one, the public disclosure bar doesn't bar claims. It just bars people from bringing claims. The government can always bring its own claims even if these relators can't. An original source can always bring the claims even if these relators can't. The only question about the public disclosure bar is whether these people can bring these claims for the government. And it sets up a very simple test for whether they can. The test is have they added any genuinely new and material information to what the government already know? Like the right to bring a key TAM claim is not something for nothing. It's something for something. And the something is genuinely new and material information beyond what was already disclosed. Now, the relators say something that I think is wrong and it's useful to explain why it's wrong. They suggest that the public disclosure bar can apply only if a valid claim was disclosed. In other words, they suggest that an invalid claim can't ever be barred by the public disclosure bar. They say that all the elements of a fraud need to have been disclosed, putting the government on notice. If the government wasn't put on notice, it can't be. That is not the public disclosure bar. The public disclosure bar textually says if the allegations are substantially the same as what can be a valid claim that was not disclosed. There can be a valid claim that was disclosed. Think a strong claim but a strong disclosure. There can be an invalid claim that was not disclosed, weak claim but nobody said anything about it. And there can be an invalid claim that was disclosed, a weak claim with a weak disclosure. That's this case. This is a weak claim with a weak disclosure. Counsel for the relators admitted and they emphasize in their brief Senate argument this morning that the simple combination of prescriptions to Medicaid, submitted to Medicaid, plus payments to doctors does not state a claim. Why do they say that? They say it's not even enough to put the government on inquiry notice. Why? Because if they admit that payments to doctors plus prescriptions is enough to put the government on notice, their claim is barred because that's all publicly reported. You need something more. But here, they don't allege the anything more. As my colleague said, if they alleged payments that were made but not reported, that's something more. If they allege payments for something that wasn't actually provided, they said it was a conference, it was actually golf clubs, that would be something more. If they're a genuine insider and they have the emails inside that say, hey, let's do this because we think we could induce more prescriptions, that's something more. That's material and new. That's what's completely missing here as to Santa Fe, your honors, and I've gone through that. The last thing I'll say is that this X plus Y versus Z formula, that's not the statutory test. The statutory test is substantially the same as. This court has applied X plus Y equals Z when it's useful. It hasn't applied it when it's not. The most recent case, Sam Jones versus Biotronic, doesn't come up at all. But here's the really important point when that test is used. The important point is that a claim can be barred. A public disclosure can be made either from the X plus Y, from facts, or Z in like a public disclosure can come from either place. But to overcome the public disclosure, the only thing that counts is why. Facts. Honest to goodness facts about what really happened that the government didn't have. You know, this court started this in the Metesky case. It said it has to be genuinely new and material information because if you aren't bringing something new, you don't get the right to assert the government's claim. That's the trade. Here, they don't have facts. They don't have well-pleaded facts. Judge Lee, your honor, asked about the interaction between Rule 9b and the public disclosure bar on this, and here's what I said on that. The public disclosure bar itself insists that the plead it. It doesn't count. The text of it says it is decided on the allegations, right? It happens at the stage because it's a bar at the front. You can't go forward. This is not one of those situations where a jury is the ultimate decision maker. The judge is the decision maker. The statute says the court shall dismiss it if the allegations are substantially similar. So it happens there. I don't think it's a factor of 9b, your honor. It comes straight from the statute itself and said if it's not substantially the same, they're dismissed, which means the relators have to allege it because it's only allegations that count. It's not a burden on them because they have to provide all the information they have to the government in the first place. It's not as if they're being required to allege something that's outside of their knowledge. They have to have the knowledge. That's the reason they get to bring the claim in the first place for the government. And there's no bar on the court deciding it because it's comparing the allegations and the defendants can have what's publicly disclosed that's on them. So just to wrap up, your honors, I'm glad to answer any questions, but as to Sanofi, this is really easy on the public disclosure bar. Thank you. Thank you. Just a couple quick points, your honors. So first, I did look back at that one allegation about the $10,000 and that one, you're correct, that one did not specifically allege a particular position, but I would just add that I think the overarching point is that was just one more point in the holistic analysis that shows that there was fraud and satisfies Rules 9B. A couple things in response to what my colleagues on the other side mentioned in their arguments. The fair market value determination, I think it's a distraction as to whether the government presumably thought these were within fair market, these payments were within fair market value or not. That is complete speculation unsupported by anything in the record or judicially noticeable materials. I think it's more telling that Regeneron and Sanofi, as alleged in the First Amendment complaint, they established what was a fair market value and we allege scores of instances where payments went many times above what their own fair market value determinations were. But I think the larger point on that issue is this. The case does not turn on whether the payments satisfied the fair market value standard. The case turns upon the purpose of the payments and was the purpose to induce referral for these prescriptions that were then reimbursed by Medicare. The fair market value examples that we allege in the First Amendment complaint are simply alleged to provide more indicia that there was no legally permissible purpose behind these payments because as shown by the fact that they departed dramatically from their own internal fair market value determinations, that just shows the real purpose of these payments. One other point I would make on Sanofi, we allege more than what my friend on the other side says. Specifically, we allege in paragraph 155 that Sanofi conducts the same kind of return on investment analysis that Regeneron does. Those are proof that the goal here is to pay this money to facilitate increased prescriptions. We allege in paragraph 160 that Sanofi blends its tracking metrics with Regeneron's metrics to ensure its programs are having their intended effects. They are working together. This whole thing is a co-marketing arrangement as well. We allege Sanofi's trouble with corporate integrity agreements in the past. We allege that Sanofi staffed out their offices with its own sales reps. That's paragraph 217. And then we allege multiple payments by Sanofi, Drs. KK, QQ, MM, B, SS, and ZZ. Those are all alleged specifically as to Sanofi in particular. And so with my time expiring, your honor, I will just ask that the court reverse the dismissal. Great. Thank you. Thank you all for the excellent advocacy. Case is submitted.
judges: BYBEE, LEE, ALBA